IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Withholding Tax – Liable Entity

ELIZABETH M. McCOOL,          )
                                         )
        Plaintiff,              )     TC-MD 210259G
                                         )
        v.                        )
                                         )
DEPARTMENT OF REVENUE,    )
State of Oregon,                )
                                       )
        Defendant.      )     **DECISION**

Plaintiff appealed from Defendant's Notice of Liable Entity, which assessed taxes on her under ORS 316.207 that were owed by the company of which she was an officer. The periods at issue are the second, third, and fourth quarters of 2018.

Although the parties briefed motions for summary judgment, at the time set for oral argument they requested that the court make findings of fact based on the written evidence and agreed to hold a trial without witnesses.[1] Plaintiff was represented by Carol Vogt Lavine, attorney-at-law, and Defendant was represented by Kelvin Adkins-Heljeson, Operations and Policy Analyst. The court received Stipulated Exhibits A to W, Plaintiff's Exhibits 1 to 5, and declarations from Plaintiff and Carol Lavine.

## I. STATEMENT OF FACTS

Plaintiff's parents entered the newspaper business in 1953 with their purchase of The Bend Bulletin. (Stip Facts, ¶ 1.) The business expanded, and by 1974 the family owned several publishing and broadcasting companies that were merged into a single parent company, Western Communications, Inc. ("WesCom"). (Ex B.) Until his semi-retirement around 1993, Plaintiff's

---

[1] Plaintiff was reportedly very ill, casting doubt on the feasibility of a trial if both parties' motions for summary judgment were denied.

father served as chairman of WesCom's board of directors as well as WesCom's president and the editor of The Bend Bulletin. (Stip Facts, ¶ 2.) At that time, the family chose Plaintiff to succeed her father as board chair. (*Id*., ¶ 3.)

Under the bylaws adopted August 6, 2004, which were those in effect during the periods at issue, WesCom's chairman of the board was an officer—the officer with "general supervision, direction and control of the business and affairs of the corporation." (Ex F at 7–8.) The president, according to those bylaws, was "the company's chief operating officer, performing such duties as may be directed by the board of directors." (*Id*. at 8.)

Because neither Plaintiff nor her siblings were professional publishers, when Plaintiff became board chair "it was unanimously determined that the business would be run by professional management." (McCool Decl, ¶ 11; *see also* Ex E at 3.) In 1994, the board of directors hired Gordon Black, a newspaper industry veteran, to serve as WesCom's president and as publisher of The Bend Bulletin. (*Id*., ¶ 12.) Black in turn hired another newspaper veteran, John Costa, as the The Bend Bulletin's editor. (*Id*., ¶¶ 16–17.) When Black resigned in 2015, the board of directors approved his appointment of Costa to take over as president and publisher. (*Id*., ¶ 18.) Plaintiff was "never involved in any hiring or firing decisions" other than hiring Black and approving Costa's appointment as Black's successor. (*Id*., ¶ 24.)

Costa, like Black before him, "set the editorial and commercial direction for Wescom, making decisions about the markets their companies would serve, the type of content they would offer their audience, and was responsible for budgeting and reporting to the Board." (McCool Decl, ¶¶ 14, 20.) Costa was required to obtain the Board's approval of the budgets he submitted, but otherwise did not need the Board's approval for "most decisions." (*Id*., ¶ 21.) He made all hiring decisions, including the hiring of a Chief Financial Officer, Mark Owings, without Board

input or approval in late 2017.  (*Id*., ¶¶ 22–23; *see* Ex G at 1.)

Plaintiff describes her "primary responsibility" as reporting back to the family on "the actions taken by the professional management."  (McCool Decl, ¶ 4.)  Following the departure of Owings's predecessor as Chief Financial Officer, Plaintiff made the following report at an October 2017 board meeting: "When someone like Heidi or Emma leaves, it allows us to see our strengths and weaknesses in the department.  We are reorganizing it and fixing what is broken."  (Ex G at 1.)  After Owings began in November 2017, Plaintiff met daily with him and Costa "as an observer."  (McCool Decl, ¶¶ 27–28.)  At those meetings, Costa and Owings would "review Wescom's cash position and which vendors to pay, as well as collaborat[e] on Wescom's annual budgets[.]"  (*Id*.)  Plaintiff was at times asked her opinion regarding payment of WesCom's creditors, but she did not make decisions on those issues before WesCom's bankruptcy.  (*Id*., ¶ 54.)  Plaintiff received a salary and was one of five signatories on WesCom's bank accounts.  (*Id*., ¶ 56; *see* Ex V at 24–33.)

2017 was a "bleak" year for WesCom financially, with sharp revenue reductions in both advertising and circulation.  (Ex H at 1–2.)  To make matters worse, an error in WesCom's instructions to its credit card processor resulted in over $400,000 being unnecessarily withheld and paid over to the IRS from December 2017 through March 2018.  (Exs I at 4; J at 1.)

From late 2017 through at least the middle of 2018, Plaintiff was involved in negotiations to sell WesCom's building in Bend and lease back a portion of it at a lower monthly rate.  (*See* Exs G at 3–4; I at 1.)  Those efforts were ultimately unsuccessful.  (McCool Decl, ¶ 51.)  In February 2018, Plaintiff renewed a $1,250,000 loan, and in she obtained another $282,000 loan in September 2018, shortly before her husband's death.  (*Id.*, ¶ 49.)  She and her husband were personally liable for those loans.  (*Id.*)

Plaintiff's husband was hospitalized on May 28, 2018, and never returned home before he died in late September 2018. (McCool Decl, ¶¶ 32–44.) Throughout that time, Plaintiff visited him daily, did his shopping and cleaning after he was moved to a senior living facility, and represented him in his medical treatment because he could not act on his own behalf. (*Id*.)

By the summer of 2018, Plaintiff was aware that WesCom had unpaid federal withholding tax liaibilities. (McCool Decl, ¶ 46.) She does not recall discussing or becoming aware of unpaid Oregon tax liabilities before January 2020. (Id., ¶¶ 47–48.)

On October 9, 2018, Costa copied Plaintiff on an email he sent to Owings stating he was "very aware and worried about the taxes." (Ex P at 1.) Costa urged using "new money for back taxes alone" and outlined a strategy for raising the needed "million." (*Id*.) That strategy included cost cutting, increased revenue, and "talk[ing] with [Plaintiff] about the use of the near $200,000 she has remaining" from the September 2018 loan. (*Id*.) Costa also informed Owings that Plaintiff was "working on a bridge loan possibility[.]" (*Id*.)

Costa did not copy Plaintiff, but did copy Owings, on a tax-related email to a lawyer dated October 31, 2018. (Ptf's Mot Summ J, Ex 3.) In that email, Costa reported the IRS was "willing to work with us" and inquired about a notice the IRS was supposed to have sent. (*Id*.)

WesCom filed quarterly tax reports (Form OQ) with Defendant for the periods at issue in July 2018, October 2018, and January 2019. (Ex Q at 1, 13, 18.) On all three of those reports, WesCom reported $0.00 due for state withholding and transit district taxes. (*Id*.) WesCom later admitted those reports were in error because they excluded manual checks and therefore underreported wages. (Ex R at 1, 3, 5.)

On January 22, 2019, WesCom petitioned for relief from the United States Bankruptcy Court under Chapter 11 of Title 11 of the United States Code. (Ex C.) Plaintiff signed the

petition. (*Id*. at 4.) "Plaintiff continued as Board Chair during the bankruptcy proceeding to work with Wescom's bankruptcy lawyers, as needed, which essentially involved signing documents as directed by the lawyers." (Stip Facts, ¶ 4.) Another such document was the Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, which was completed for execution by Plaintiff on February 12, 2019. (Ex V at 13.)

On April 11, 2019, Plaintiff signed a client instruction letter to Paycom Payroll, LLC. (Ex S at 1.) In that letter, she referenced amended returns to be filed for federal and state taxes, including "Oregon Forms 132, OQ, Schedule B for Q2–4." (*Id*.) Plaintiff directed Paycom to "file returns with no payments to the applicable taxing authorities." (*Id*.) In the letter, Plaintiff explained that WesCom "has filed Chapter 11 Bankruptcy and must only make pay [*sic*] pre-petition debt payments with the approval of the court." (*Id*.)

WesCom's amended Form OQs were filed with Defendant on July 26 and August 15, 2019. (Ex R.) Having previously underreported wages, WesCom now reported state withholding tax due of $25,935.27 for the second quarter; $107,570.68 for the third quarter; and $33,833.79 for the fourth quarter of 2019. (*See id*.) Also on August 15, 2019, WesCom filed an amended Form OR-WR stating that statewide transit tax had been underreported "due to an administrative error." (Ex U at 1.)

Defendant sent Plaintiff an Investigation of Authority letter on January 14, 2020, questioning "who was responsible or had the authority" to perform various activities for WesCom from April to December 2018. (Ex M at 1–2.) It was on receipt of that letter that Plaintiff alleges she became aware of unpaid Oregon taxes. (McCool Decl, ¶ 48.) Plaintiff signed her response on January 28, 2020. (Ex M at 2.) In response to the question "Decide which creditors to pay?" she wrote: "Mark Owings after conferring with [Plaintiff] and John

Costa." (*Id*.) She listed only Mark Owings in response to the questions "Sign withholding tax reports?" and "Pay withholding taxes for the business?" (*Id*.) She listed herself among five people in response to "Sign checks?"; among 13 people in response to "Hire or fire employees?"; and among 21 people in response to "Set employee work schedules?" (*Id*.)

WesCom, through its lawyers, moved to dismiss its bankruptcy case on April 29, 2020, and the case was dismissed on June 8, 2020. (Exs D, O.)

On June 15, 2020, Defendant issued a Notice of Liability to Plaintiff, which stated that $195,098.15 was due upon receipt. (Ptf's Mot Summ J, Ex 2.) Defendant denied Plaintiff's appeal on February 4, 2021. (Compl., Ex 1.)

Plaintiff does not challenge the amount of WesCom's tax debts, but asks this court to determine she is not liable for them. Defendant asks the court to uphold its determination.

## II. ANALYSIS

The issue is whether Plaintiff, because of her role at WesCom in 2018, is liable for WesCom's unpaid withholding and transit tax debts under ORS 316.207 and OAR 150-316-0243.[2] On all factual questions, Plaintiff must bear the burden of proof by a preponderance of the evidence. *See* ORS 305.427.

Oregon employers are required to withhold income tax from employee wages, hold the withheld amount in trust for the State of Oregon, and pay the held funds over to Defendant quarterly along with applicable state-administered mass transit taxes. ORS 316.167(1); 316.168; 316.197; 316.202; 316.207(1). Where an employer that is a legal entity fails to do so, Defendant "may issue a notice of liability to any officer, employee or member described in ORS

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2017. The court's references to the Oregon Administrative Rules (OAR) are to those in effect in 2018.

316.162(3)(b) of such employer within three years from the time of assessment." ORS

316.207(3)(a). Under ORS 316.162(3)(b), the following are potentially liable for an entity's tax

debts: "An officer or employee of a corporation, or a member or employee of a partnership, who

as such officer, employee or member is under a duty to perform the acts required of employers

by ORS 316.167, 316.182, 316.197, 316.202 and 316.207."

ORS 316.162(3) differs from the analogous federal statute in that there is no requirement

that an officer or employee act "willfully" in failing to withhold and pay over tax. *Robblee v.*

*Dept. of Rev.*, 325 Or 515, 942 P2d 765 (1997) (*Robblee II*), *affirming Robblee v. Dept. of Rev.*,

13 OTR 505 (1996) (*Robblee I*); *see also* OAR 150-316-0243(3)(a) (finding of liability not

precluded by lack of willfulness); *cf.* IRC § 6672(a).

> "Oregon's statute does not condition personal liability on willfulness or
> knowledge of unpaid taxes. The Oregon statute simply defines 'employer' as
> including those persons who had the 'duty' to perform the acts required of
> employers. Thus, an individual might not be liable under the federal law but
> could be under Oregon law."

*Olson v. Dept. of Rev.*, 10 OTR 272, 274 (1986) (*Olson I*), *rev'd on other grounds*, 304 Or 241

(1987) (*Olson II*). Due to the lack of a willfulness element in Oregon, "federal cases in general

are neither binding nor particularly persuasive." *Robblee I*, 13 OTR at 511.

Although knowledge is not a condition of personal liability by statute, the accompanying

regulation imposes a three-part test that includes a knowledge component.[3] Under OAR 150-

316-0243(1), an officer or employee becomes personally liable when three conditions are met:

---

[3] OAR 150-316-0243(1) states, in full: "To be held personally liable for unpaid income tax withholding or statewide transit tax under ORS 316.162, a person must have been considered to have been an 'employer.' In addition, the person must have been in a position to pay the income tax withholding or statewide transit tax or direct the payment of the income tax withholding or statewide transit tax at the time the duty arose to withhold or pay over the taxes. Additionally, the person must have been aware, or have been in a position that should have been aware, that the income tax withholding or statewide transit tax was not paid to the department. An employer cannot avoid personal liability by delegating their responsibilities to another."

(1) that person was an "employer"; (2) that person was in a position to pay or direct the payment of taxes at the time the duty arose to withhold or pay them over; and (3) that person either was aware or was "in a position that should have been aware" that the tax was not paid over.

Here, the parties dispute whether Plaintiff meets all—or indeed any—of the three conditions, although Plaintiff develops arguments regarding only the first and third. The court considers each in turn.

A.    *Employer*

An officer or employee of a corporation with a duty to withhold tax from wages and pay it over to Defendant is an "employer" under ORS 316.162(3)(b). *See also* ORS 316.167(1); 316.197(1)(a). Whether a given officer or employee is duty-bound to withhold and pay tax is determined by examining that officer or employee's authority within the company. *See* OAR 150-316-0243(2) (listing indicia of authority).[4] "[T]he individual must have the requisite authority and control in form and substance within the corporate structure to order the payment of or pay the corporate tax." *McCormick v. Dept. of Rev.*, 10 OTR 380, 385 (1987).

It is the substance of an officer's duties that control, rather than the title or description of those duties in the corporate bylaws or partnership agreement. OAR 150-316-0243(3)(e). One who is "a corporate officer in name only" is not an employer. *Frutiger v. Department of Revenue*, 270 Or 821, 826, 529 P2d 910 (1974) (so holding regarding wife of the corporation's president, director, and sole stockholder, who held title of secretary-treasurer but received no

---

[4] OAR 150-316-0243(2) states: " 'Employer' includes, but is not limited to an officer, member or employee of a corporation, partnership or other business entity, if, among other duties, that individual has: (a) The power or authority to see that the income tax withholding or statewide transit taxes are paid when due; (b) Authority to prefer one creditor over another; (c) Authority to hire and dismiss employees; (d) Authority to set employees' working conditions and schedules; (e) Authority to sign or co-sign checks; (f) Authority to compute and sign payroll tax or statewide transit tax reports; (g) Authority to make fiscal decisions for the business; (h) Authority to incur debt on behalf of the business; or (i) Performed duties other than those outlined by the corporate bylaws or partnership agreement."

compensation and exercised no day-to-day supervision or control).  Even someone with the right to take control of a company is not an "employer" if that person's ability to order or pay withholding taxes first requires the ouster of those in actual control.  *McCormick*, 10 OTR at 385–86 (retired founder and board chairman who lacked signing authority not employer until he exercised right under retirement contracts to remove management).

However, where corporate formalities suggest an officer has authority to attend to "important corporate obligations" in the absence of the primary manager, the officer must prove lesser actual authority to escape liability as an employer.  *See Olson II*, 304 Or at 245.  The company in *Olson II* was owned equally by its president and vice president, who had informally agreed between themselves that the president "was responsible for management of the company," while the vice president just "ran the shop."  304 Or at 245.  Nevertheless, that limitation on the vice president's duties was not reflected in any corporate job description, and the vice president occasionally paid corporate bills while the president was absent.  *Id*. at 245– 46.  Even though those bill payments were unrelated to withholding tax, they showed that the vice president's "authority to sign checks for withholding tax payments when due would not have been questioned" by anyone at the company other than the president, and the court found the vice president liable as an employer.  *Id*. at 247.

Under WesCom's bylaws, the title held by Plaintiff ("chairman of the board") corresponds to the officer with "general supervision, direction and control of the business and affairs of the corporation."  That formal indication of Plaintiff's authority is supported by her response to Defendant's Investigation of Authority letter, in which she affirmed that she had authority to hire and fire employees, set their work schedules, and sign checks, and that Owings' authority to prioritize creditors was conditioned on first conferring with her and Costa.  Given

both her corporate title and her possession of several indicia of authority, it appears *prima facie* that Plaintiff was an employer. *See* OAR 150-316-0243(2).

Plaintiff argues that she was not an "employer" because the company was in fact run by professional management. The corporate bylaws' description of the board chair reflect the role her father played at WesCom, but it seems the role envisioned by the family after her father's retirement was more limited. Plaintiff's only hiring decisions were to fill the role of president, and the president made all hiring decisions and "most" other decisions without her approval.

Yet Plaintiff drew a salary and was actively engaged in WesCom's business. During the periods in question, she met daily with the president and the chief financial officer while they discussed budgeting and decided which vendors to pay. Although she claims to have been merely an observer, she included herself in the subject when she told the full board: "We are reorganizing [the finance department] and fixing what is broken." That evidence suggests that she at least consented to the decisions made at those meetings, which is consistent with her response to the Investigation of Authority letter. Furthermore, the email regarding repayment of WesCom's "back taxes" indicates Plaintiff was involved specifically in tax discussions and was in control of loan proceeds. There is little doubt that Plaintiff was more deferential to WesCom's management than her father had been, but she was not chairman of the board "in name only." *See Frutiger*, 270 Or at 826.

After the bankruptcy filing, Plaintiff signed directions to a payroll company to file returns without payment of tax. She asserts that she did so at the direction of WesCom's lawyers, and that is likely enough. However, no evidence suggests Plaintiff acquired more authority at WesCom following the bankruptcy; she did not need to oust the corporate president before signing documents. *See McCormick*, 10 OTR at 385–86. The fact that WesCom's lawyers

advised Plaintiff to sign suggests Plaintiff was actually a responsible officer at WesCom, whom the corporation could expect to attend to "important corporate obligations," even if she was not the manager primarily responsible for them. *See Olson II*, 304 Or at 245.

The plainest reading of the evidence is that, even though Plaintiff relied heavily on professional management, she retained general supervisory responsibility over WesCom's financial affairs. She demonstrated authority to withhold payment of taxes, make fiscal decisions, and incur debt; she was also involved in decisions about which creditors to pay. *See* OAR 150-316-0243(2). Plaintiff was an "employer" under ORS 316.162(3)(b).

B.       *In a Position to Pay*

As stated above, Plaintiff does not separately argue whether she was in a position to pay the tax. The same evidence showing Plaintiff qualified as an "employer" under ORS 316.162(3)(b) also shows she was in a position to pay or direct the payment of the tax when it was due. In particular, her check-signing authority and her general supervisory authority would have allowed her to attend to that important corporate obligation. *See Olson II*, 304 Or at 245.

C.       *In a Position That Should Have Been Aware*

To be held personally liable, an employer "must have been aware, or have been in a position that should have been aware," that the tax was not paid. OAR 150-316-0243(1). Plaintiff asserts that she did not learn the state taxes were unpaid before receiving Defendant's Investigation of Authority and was thus unaware of the tax delinquincy at the relevant times. Accepting that assertion for the sake of argument, the question becomes whether Plaintiff was "in a position that should have been aware."

Plaintiff's chief argument is that she was in no position to know about WesCom's state-tax delinquency because during 2018 she "spent considerable time and effort, on a daily basis,

representing [her husband] with respect to his medical care and taking care of the numerous daunting tasks his illness and subsequent death required." (Ptf's Response at 8.) In that argument, the word *position* apparently refers not to Plaintiff's job at WesCom, but more broadly to her entire situation in life. Considering all of her duties—to her family as well as her company—Plaintiff suggests she could not be expected to have known all about her company's finances at such a time.

However, the statute that OAR 150-316-0243 implements takes a narrower view of a corporate officer's duties. The definition of ORS 316.162(3)(b) includes officers, employees, and members who "as such" are duty-bound to perform the acts required of employers. The phrase "as such" limits consideration to those duties arising from the person's status as an officer, employee, or member. That restricted sense is reflected in OAR 150-316-0243 itself, in which the only use of the term *position* in the list of factors refers specifically to a corporate job: a finding of liability is not precluded by a "corporate bylaw or partnership agreement position description to the contrary[.]" OAR 150-316-0243(3)(e).

To "have been in a position that should have been aware" therefore means to have held a position of responsibility within a company, in virtue of which one would be expected to know about unpaid taxes.

While Plaintiff's husband's illness was a severe challenge for her, there is no suggestion that Plaintiff ceased to act as board chair during the relevant period. On the contrary, the evidence shows she participated in daily meetings and obtained financing for WesCom in the months and days preceding her husband's death.

As board chair, Plaintiff was in a position to be aware of the status of WesCom's tax obligations. While the reporting and payment of taxes were Owings's responsibilities, Plaintiff

had access to information about WesCom's finances, creditors, and taxes—she met daily with the president and CFO. The email of October 9, 2018, shows that Plaintiff knew WesCom had significant unpaid tax liabilities. Although Plaintiff may not have known specifically about the unpaid state taxes, she had reason to know it was possible the state taxes were unpaid. As the corporate officer with general supervisory authority, it was incumbent on Plaintiff to inform herself about the matter. *See Robblee II*, 325 Or 515 at 529 (holding corporate president liable where president knew nonpayment of state taxes was a possibility).

### III. CONCLUSION

Because the evidence shows that, pursuant to ORS 316.162(3)(b) and OAR 150-316-0243, Plaintiff was a corporate officer under a duty to see that withholding and transit taxes were paid, she is liable for WesCom's unpaid taxes pursuant to ORS 316.207. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this _____day of April 2022.


_____
POUL F. LUNDGREN
MAGISTRATE


*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on April 25, 2022.*